IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **URSULA MCGLONE, JASON MCGLONE, L.M., G.M., B.M., E.M.,** and **M.M.,** minor children by and through their parent and natural guardian, Ursula McGlone, **JULIA DUNHAM, K.D.** and **C.D.,** minor children by and through their parent and natural guardian, Julia Dunham, **ADAM RIDER, BRITTANI RIDER, M.R., C.R., L.R.** and **L.R.,** minor children by and through their parent and natural guardian, Brittani Rider, Ohio residents, on behalf of themselves individually and all others similarly situated | § § § § § § § § § § § | CASE NO.<br><br>JUDGE |
| Plaintiffs, | § | |
| **v.** | § § | |
| **CENTRUS ENERGY CORP.**, a Delaware Corporation, individually and as successor-in interest to USEC Incorporated, | § § § § | **CLASS ACTION COMPLAINT**<br><br>**Jury Demanded** |
| **UNITED STATES ENRICHMENT CORPORATION,** a Delaware Corporation, | § § § § | |
| **URANIUM DISPOSITION SERVICES, LLC,** a Tennessee Limited Liability Company, | § § § | |
| **BWXT CONVERSION SERVICES, LLC,** a Delaware Limited Liability Company, | § § § § | |
| **MID-AMERICA CONVERSION SERVICES,** a Delaware Limited Liability Company, | § § § § | |
| **BECHTEL JACOBS COMPANY, LLC,** a Delaware Limited Liability Company, | § § § | |
| **LATA/PARALLAX PORTSMOUTH, LLC,** a New Mexico Limited Liability Company, | § § § | |
| **FLUOR-BWXT PORTSMOUTH, LLC** , an Ohio Limited Liability Company**,** | § § § § | |
| Defendants. | § | |

## I. INTRODUCTION

Plaintiffs, Ursula McGlone, Jason McGlone, L.M., G.M., B.M., E.M., and M.M., minor children by and through their parent and natural guardian Ursula McGlone, Julia Dunham, and K.D. and C.D., minor children by and through their parent and natural guardian, Julia Dunham, Brittani Rider, Adam Rider, M.R., C.R., L.R. and L.R., minor children by and through their parent and natural guardian, Brittani Rider, on behalf of themselves individually and all others similarly situated (collectively "Plaintiffs"), through undersigned counsel, hereby file this Complaint. Based on their personal knowledge, information and belief, as and for their Complaint for civil penalties, equitable and injunctive relief against Defendants, Plaintiffs respectfully allege as follows:

1. There is an existing federal action involving the same parties: *McGlone v. Centrus Energy Corp.,* No. 2:19-cv-21986-ALM-EPD (S.D. Ohio). Pursuant to *Frilling v. Honda of Am. Mfg., Inc.*, No. C-3-96-181, 1996 WL 1619348, at *4-5 (S.D. Ohio Oct. 21, 1996), Plaintiffs commence this new action in order to subsequently consolidate with the existing lawsuit.

## II. NATURE OF THE ACTION

2. In Pike County, Ohio sits the 3,777-acre Portsmouth Site which has accommodated uranium enrichments operation by Defendants.

3. What the populace did not know was that the operations at the Portsmouth Site expelled air laden with radioactive material and other harmful constituents, and other surface water and groundwater releases.

4. Winds have carried the radioactive materials and other harmful constituents throughout the area in such concentrations that radioactive materials and other constituents can be found deposited in soils and buildings in and around Piketon, Ohio.

5.      On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site and serves more than 300 students. This incident was the first notification to the community about radioactive materials migrating into populated areas from the Portsmouth Site.

6.      Releases of radioactive material from the Portsmouth Site exceed levels of radiation and concentrations of radioactive materials permissible in unrestricted (general public) areas.

7.      In addition to radioactive material, Defendants have caused the Portsmouth Site to release harmful constituents directly into the environment and which directly impact humans, both on-site and off-site, and including both hazardous and non-hazardous constituents. These constituents have been released into the soil, air, and groundwater. The constituents include wastes and non-wastes that are generated via the production and enrichment of uranium and related operations on-site.

### III.      PARTIES, JURISDICTION, AND VENUE

8.      Putative Class Representatives and Plaintiffs Ursula McGlone and Jason McGlone are married, above the age of majority, and live approximately two miles from the Portsmouth Site on property they own. Recent scientific testing shows their property to be impacted with radioactive and toxic materials. The McGlones were unaware until such testing that their property had been contaminated with radioactive and toxic materials.

9.      Putative Class Representatives L.M., G.M., B.M., E.M., and M.M. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian,

Ursula McGlone. L.M., G.M., B.M., E.M., and M.M. live approximately two miles from the Portsmouth Site. They live within the zone of impact.

10. Putative Class Representative and Plaintiff Julia Dunham is above the age of majority and lives approximately four miles from the Portsmouth Site on property she owns. Recent scientific testing shows her property to be impacted with radioactive and toxic materials. Julia Dunham was unaware until such testing that her property had been contaminated with radioactive and toxic materials.

11. Putative Class Representatives K.D. and C.D. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Julia Dunham. K.D. and C.D. live approximately four miles from the Portsmouth Site. They live within the zone of impact.

12. Putative Class Representatives and Plaintiffs Adam Rider and Brittani Rider are above the age of majority and live approximately four and one-half miles from the Portsmouth Site on property they own. Recent scientific testing shows their property to be impacted with radioactive and toxic materials. The Riders were unaware until such testing that their property had been contaminated with radioactive and toxic materials.

13. Putative Class Representatives M.R., C.R., L.R. and L.R. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Brittani Rider. M.R., C.R., L.R. and L.R. live approximately four and one-half miles from the Portsmouth Site. They live within the zone of impact.

14. Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc."), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

15. Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus Energy Corp.

16. Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principal place of business in Florida.

17. Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principal place of business in Kentucky.

18. Mid-America Conversion Services, LLC ("MCS") is a Delaware limited liability company with its principal place of business in Kentucky.

19. Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principal place of business in Tennessee.

20. Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principal place of business in New Mexico.

21. Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") is an Ohio limited liability company with its principal place of business in Ohio.

22. Original jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, because this action arises under multiple laws of the United States.

23. This Court is also vested with jurisdiction by virtue of 28 U.S.C. § 1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, all of whom are citizens of the State of Ohio, and Defendant Centrus, a citizen of Delaware, its state of incorporation, and Maryland, its headquarters and principal place of business location. The proposed class exceeds 100 persons and the amount in controversy exceeds $5,000,000.00.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), as a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.     FACTUAL ALLEGATIONS

### Operations at Portsmouth Site Gaseous Diffusion Plant

25.     Located at the Portsmouth Site is the Portsmouth Gaseous Diffusion Plant, or the "A-Plant" as the locals refer to it. In July 1993, USEC assumed the uranium enrichment operations at the Portsmouth Gaseous Diffusion Plant and operated the plant until 2001.

26.     The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U-238.

27.     From 2001 to 2011, USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration. Initially, the process equipment was kept in Cold Standby, capable of restart if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning.

### Depleted Uranium Hexafluoride Conversion Plant

28.     In 2002, Uranium Disposition Services, LLC was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant").

29.     Depleted uranium hexafluoride (DUF6) is a coproduct of the uranium enrichment process that occurred at the Portsmouth Site. The DUF6 Conversion Plant was designed and constructed to convert inventory of DUF6 produced by the Paducah Gaseous Diffusion[1] and the Portsmouth Gaseous Diffusion Plants, to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A coproduct of the conversion process is hydrofluoric acid

---

[1] The Paducah Gaseous Diffusion Plant is located in McCracken County, Kentucky, near Paducah, Kentucky.

(HF), which is reused industrially. The Portsmouth DUF6 inventory is expected to be processed in approximately 18 years.

30. In 2010, BWXT Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. BWXT was also responsible for continuing cylinder surveillance and maintenance (S&M) services for the inventory of DUF6, low-enrichment uranium hexafluoride (UF6), normal UF6, and other cylinders. The contract was initially scheduled to expire in September 2016 but was extended to accommodate procurement for a new DUF6 operations contract.

31. In 2016, MCS was contracted to operate the DUF6 Conversion Plant. MCS is responsible for providing cylinder surveillance and maintenance for the DUF6 conversion facility and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at Paducah and Portsmouth to uranium oxide; reusing, storing, transporting, and/or disposing of the DUF6 conversion process end-products; selling the aqueous hydrofluoric acid (AqHF) product; and, providing S&M services for the cylinder storage yards.

### Centrifuge Operations

32. In 2002, USEC Inc. signed a lease for use of centrifuge-related equipment and facilities at the Portsmouth Site.

33. In 2004, USEC Inc. began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop which demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. In 2016, USEC's successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions need to ultimately decommission the facility. The Lead Cascade is currently in decommissioning phase.

34. The Lead Cascade was a test loop for USEC's, now Centrus's, American Centrifuge Plant ("ACP"). Construction began on the ACP in 2007 and was demobilized in 2009. On January 7, 2019, it was announced that the facility would be opened again, and the ACP is currently under construction.

35. Centrus's centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion on Plaintiffs' properties.

**Environmental Remediation and Waste Management**

36. Environmental cleanup at the Portsmouth Site began in 1989, and it continues today. At all material times to this lawsuit, environmental remediation was and is being conducted.

37. Between 1997 and 2005, Bechtel Jacobs Company, LLC ("Bechtel Jacobs") was responsible for environmental remediation at the Portsmouth Site.

38. Between 2005 and 2010, LATA/Parallax Portsmouth, LLC ("LATA/Parallax") was responsible for environmental remediation at the Portsmouth Site. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning (D&D) facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

39. From 2010 to present, Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") has been responsible for environmental remediation at the Portsmouth Site. Fluor-BWXT's work is expected to continue until 2024.

40. In 2015, a plan was agreed to for disposing of more than 2 million cubic yards of waste that would be generated from the Portsmouth Site's decontamination and decommissioning process. This plan includes construction of an on-site waste disposal facility.

41. Construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

**Releases and Statistically Significant Increase in Cancer**

42. Recent evidence collected, including reports by DOE, NIOSH, and EPA, demonstrate that there have been multiple instances of release of contaminants, radioactive, harmful, and/or hazardous to the water and air in violation federal statutes and/or regulations.

43. Recent scientific testing performed at locations adjacent to the plant on publicly accessible areas supports a conclusion that external radiation levels exceed the allowable level of exposure to members of the public under federal law.

44. Levels of all cancers more than 7 times the rate expected on the basis of national data were recorded between 2011 and 2016 in the small zip code of Jasper, Ohio, which lies to the west of the PORTS plant and along the Scioto River.

45. Analysis of cancer rates for all cancers combined in the Census Tracts adjacent to the plant shows a statistically significant rate of 60% excess risks of all cancers between 2011 and 2016 based on national data. Zip code data identify lung cancer as a major issue in this area.

46. The counties which contain and are adjacent to the plant, namely Pike, Scioto, Vinton, Adams, and Lawrence, are among those having the highest cancer rates in the State of Ohio.

47. These high levels of cancer in the counties, in the areas near the site, and along the rivers and streams draining the land near the plant and to which the discharges have historically been released are consistent with the exposures of individuals living in these areas to the radioactive materials emanating from the plant.

**Defendants' Operations Spread Radioactive Particles Off-Site
Into Unrestricted Areas and Contaminated Plaintiffs' Properties**

48.     Plaintiffs' properties are within the zone impacted by radioactive materials, including alpha-emitting radionuclides. Samples taken on and around Plaintiffs' properties and at other locations near the Portsmouth Site confirm an elevated presence of radioactive particles, which presents a substantial and imminent risk of harm.

49.     Environmental evidence gathered thus far indicates that property and persons near the Portsmouth Site have been and continue to be exposed to toxic, harmful, and/or radioactive substances and are negatively impacted by toxic, harmful, and/or radioactive releases from the Portsmouth Site.

50.     Plaintiffs' environmental sampling and scientific testing of properties near the Portsmouth Site reveal the presence of radioactive, harmful, and toxic materials consistent with those expected to be found near a site such as the Portsmouth Site where uranium enrichment operations are conducted. Tests reveal the presence of these radioactive, harmful, and toxic materials in residences near the Portsmouth Site.

51.     Scientific analysis of samples has revealed the presence of "fingerprints" linking the hazardous, toxic, carcinogenic, radioactive materials either stored, processed, and/or manufactured at the Portsmouth Site to the contamination.

52.     Jason and Ursula McGlone's Property is approximately two miles from the Portsmouth Site. This proximity puts the McGlone's Property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, as well as non-radioactive harmful constituents, most if not all of which emanate from the Portsmouth Site.

53.     On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site. The school serves more than 300 students.

54.     Zahn's Corner Middle School remains quarantined and closed.

55.     K.D. is a student of Zahn's Corner Middle School. She was evacuated from the school after the detection of enriched uranium.

56.     Testing done by the Northern Arizona University dated April 27. 2019, and which was provided to Defendants via the Notice Letter, included detailed information about dozens of samplings in the area. The study (attached hereto as **Exhibit A**) found enriched uranium detected inside Zahn's Corner Middle School. Neptunium-237 was also detected by an air monitor next to the school. The study also found highly radiotoxic transuranic isotopes at the school and other locations in dust, soil, sediments, and water, including plutonium-239, neptunium-237, and plutonium-240.

57.     A recent study conducted by Northern Arizona University, provided to Defendants via the Notice Letter, included detailed information about dozens of samplings in the area. The study[2] determined that:

A.     Enriched Uranium is found in surface waters, sediments, and interior dusts in the Piketon area which are consistent with the operations at the Portsmouth Site.

B.     Non-fallout $^{237}$Np (Neptunium) and Pu (Plutonium) isotopes are found in bed sediments, suspended sediments, and interior dusts in the Piketon area.

---

[2] Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium, and Plutonium in Environmental Samples Near Piketon, Ohio,* April 27, 2019.

C.        Non-fallout $^{237}$Np (Neptunium) is found in sediments of an unnamed creek that is draining a landfill construction area that is currently being worked.

D.        Enriched Uranium is found in interior spaces of Zahn's Corner Middle School, and in attic dust in the Piketon area.

E.        Emissions from the Portsmouth Site account for the enriched contents of Uranium, Neptunium and Plutonium encountered in environmental samples from the Piketon area.

*See* Exhibit A.

### Hazardous Substances and/or Wastes

58.    One or more of Defendants are responsible for PORTS continuing to release hazardous substances and/or wastes from the facility to off-site areas.  The waste stream which has been and continues to be released from PORTS is mixed, and includes, but is not limited to, radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium, Plutonium, Cesium, Thorium, and Radium; toxic metals, heavy metals, Polychlorinated biphenyls (PCBs) (including dioxin forms of PCBs); Trichloroethylene (TCE); and other organic and inorganic materials. By releasing this mixed waste stream in violation of their permit, standards, regulations, conditions, requirements, and prohibitions under the Resource Conservation and Recovery Act ("RCRA"), one or more of Defendants, as Responsible Parties, are liable under 42 U.S.C. § 6972(a)(1)(A). Because one or more of Defendants have contributed or are contributing to the past or present handling, storage, treatment, transportation, or disposal of any sold or hazardous waste which may and does present an imminent and substantial endangerment to health and the environment, which is prohibited by RCRA, Defendants are Responsible Parties and are liable under 42 U.S.C. § 6972(a)(1)(B). One or more of Defendants, as Responsible Parties, have violated and continue to violate "an effluent standard or limitation" under Section 505(a)(1)(A) of the Clean

Water Act ("CWA"), 33 U.S.C. § 1365(a)(1)(A), by failing to comply with the terms of the National Pollution Discharge Elimination System ("NPDES"). One or more of Defendants, as Responsible Parties, are also in ongoing and continuing violation of section 301 of the CWA, 33 U.S.C. § 1311, as a result of the unpermitted and unlawful discharge of radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium, and Plutonium. One or more of Defendants, as Responsible Parties, are in violation of the Clean Air Act ("CAA") because PORTs has emitted and continues to emit radionuclides to the ambient air from the facility in excess of an amount that would cause any member of the public to receive in any year an effective does equivalent of 10 millirem (mrem) per year. 42 U.S.C. § 7401. One or more of Defendants, as Responsible Parties, are also in violation of the CAA because PORTS has emitted and continues to emit hazardous air pollutants in violation of applicable limitations and standards.  42 U.S.C. § 7412.

59.     The Facility has been inspected by state and federal regulators, and those inspectors have often found RCRA violations, Clean Water Act violations, violations that amount to contributing to an imminent and substantial endangerment to human health and the environment, and Clean Air Act violations. These include, but are not limited to, the following inspections, which detail the specific facts surrounding these violations and causing what amounts to statutory endangerment:

      A.     August 2-4, 1993

      B.     June 19, 2000

      C.     June 9-11, 2003

      D.     August 10-11, 2004

      E.     March 7-9, 2005

F.      June 19-22, 2006

G.      August 7-9, 2007

H.      November 3, 2008

I.      June 22-23, 2009

J.      December 16, 2009

K.      June 27, 2011

L.      May 14-15, 2012

M.      June 17-18, 2013

N.      March 24-26, 2014

O.      May 21, 2014

P.      April 13-14, 2015

Q.      July 13, 2016

R.      April 17, 2018

S.      June 25-26, 2019

T.      January 29, 2020

60.     The facts set forth in the consent decrees and related Ohio EPA Director's Final Findings and Orders related to DUF6 (1989, 1994, 1997, 1998, 1999, 2010) also establish violations of RCRA, the Clean Water Act, the Clean Air Act, and also establish an imminent and substantial endangerment to human health and the environment.

61.     According to the Heavy Metal Sludge Characterization Plan, the Site has emitted hazardous waste streams that includes cadmium, lead, and mercury. The same Plan noted that the Site has found containers leaking beryllium, cadmium, and arsenic. The site has also documented other toxic metal wastes that were disposed of at the Site.

62. Environmental sampling confirms the off-site and on-site impacts from emissions, leaks, and releases of solid and hazardous wastes. For example, sampling performed by Boston Chemical Data Corp. of radionuclides and other contaminants, which was provided to the Defendants in the December 17, 2019 Notice Letter, includes detailed information about sampling locations, dates, and results.

63. Analyses of radionuclides, metals, and fluorinated compounds and other pollutants links off-site impacts to the Facility.

64. Radioisotope testing by Eberline Analytical and others found that Plaintiffs' properties have been contaminated with radioactive material, including, but not limited to, uranium and a uranium-decay product, thorium, and where concentrations are highest closer to the Site. This testing was provided to Defendants in the December 17, 2019 Notice Letter and includes detailed information about sampling locations, dates, and results.[3]

65. Soil, dust, and sediment testing of off-site locations in the area has revealed PCB contamination, including at rates up to ten times the background concentration. This includes, but is not limited to, PCB-118, a form of PCB associated with the Facility. Concentrations of PCBs in sediments at off-site locations downstream of the Site were thirty times higher than at off-site locations upstream of the Site. This testing was provided to Defendants in the December 17, 2019 Notice Letter and includes detailed information about sampling locations, dates, and results.

66. Soil sampling showed toxic chemicals associated with the Site at concentrations above backgrounds. For example, beryllium and cadmium, which are both associated with the Site operations. This testing was provided to Defendants in the December 17, 2019 Notice Letter, and includes detailed information about sampling locations, dates, and results.

---

[3] Plaintiffs do not file the testing data as an exhibit to this Complaint because it is in spreadsheet form and is too voluminous to file using CM/ECF.

15

67. Plaintiffs allege the following claims not subject to the Price-Anderson Act.

## V. COUNT 1 – RCRA "VIOLATIONS" CLAIMS UNDER 42 U.S.C. § 6972(a)(1)(A)

68. All allegations set forth above are incorporated by reference as if fully set forth herein.

69. Plaintiffs assert several claims pursuant to RCRA's "violations" citizen suit provision, 42 U.S.C. § 6972(a)(1)(A). Section 6972(a)(1)(A) authorizes Plaintiffs to file an action against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." Defendants are in violation of RCRA laws and regulations, and corresponding laws and regulations of the State of Ohio (implemented under the authority of RCRA and incorporating the federal regulations).

70. RCRA-authorized laws within Ohio's Solid and Hazardous Waste law, Ohio Revised Code (ORC) Chapter 3734 ("Solid and Hazardous Wastes"), and regulations within Ohio's Administrative Code (OAC), Ohio Environmental Protection Agency rules, including, but not limited to, Chapters 3745 and 3747, are "regulations" that have become effective pursuant to RCRA, and are "regulations" within the meaning of 42 U.S.C. § 6972(a)(1)(A).

71. Plaintiffs are "person[s]" within the meaning of RCRA. 42 U.S.C. § 6903(15); 40 C.F.R. § 260.10.

72. Defendants are "person[s]" within the meaning of RCRA. 42 U.S.C. § 6903(15); 40 C.F.R. § 260.10.

73. The Portsmouth Site is a "facility" as defined in 40 C.F.R. § 260.10.

74. Defendants are "generators," "operators," and "transporters" of the facility within the meaning of RCRA. 40 C.F.R. § 260.10.

75.     In the course of operating the facility, Defendants generated, stored, disposed of, and transported large quantities of "solid waste", as defined in 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.2, at the Site.

76.     The wastes at the Portsmouth Site constituting "solid waste" includes, but is not limited to, both hazardous and non-hazardous uranium enrichment processing byproducts, wastes, and all other wastes generated in the course of Portsmouth Site's operations.

77.     Certain solid waste disposed of, stored, or treated by Defendants is "hazardous" waste as defined at 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.3.

78.     The wastes at the Site and near the Site constituting "hazardous waste" includes, but is not limited to, Plutonium-239, Neptunium-237, Cesium-137, Thorium-230, Uranium-238, Uranium-234, Radium-226, Technetium-99, PCBs, Beryllium, Cadmium, Arsenic, Trichloroethylene, and chemicals reported by the Department of Energy in Table 2.1 of the Hazardous Chemical Inventory Report from 2017. Other hazardous wastes include those listed in the RCRA Permit Modifications, (September 17, 2015) and the EPA Form "Notification of Regulated Waste Activity" dated June 2, 1993.

79.     The following wastes at the Site are a specific type of "hazardous wastes" under 42 U.S.C. § 6924(d), paragraph 2, because they are either listed via Section 6921, have certain heavy metal concentrations, or meet the qualifications of Sections (2)(A) through (E). In addition, because of the quantity, concentration, or physical, chemical, or infectious characteristics, these wastes may cause, or significantly contribute to, an increase in mortality or an increase in serious, irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed. These "hazardous" wastes include, but are not limited to, Dioxins and Dioxin-

like PCBs. The Dioxins and Dioxin-like PCBs likely stem from the Portsmouth Site's electrical equipment fires and disposal.

80.     Defendants are past or present generators, past or present transporters, and past or present operators of a treatment, storage or disposal facility, including, but not limited to, the Portsmouth Site.

81.     Since 1993, Defendants have stored and possessed numerous solid and hazardous wastes at the Portsmouth Site. As a direct and proximate result of Defendants' handling of waste, Defendants have disposed of and continue to dispose of solid and hazardous wastes by allowing them to spill, leak, seep, and be released on occasion into the surrounding areas of the property and beyond the property boundary, and to remain in the soil and on Plaintiffs' property. These acts continue daily in the Site area and constitute daily "disposal" of "hazardous" and "solid" wastes as defined by RCRA in 42 U.S.C. § 6903.

82.     Defendants' disposal of solid and hazardous waste was not done in accordance with a RCRA treatment, storage, or disposal permit, constituting a violation of 42 U.S.C. § 6925(a).

83.     Defendants routinely "lost" waste, resulting in remedial actions mandated by EPA and the Department of Energy ("DOE").

84.     Defendants, on numerous occasions, mislabeled waste, resulting in improper and illegal disposal of waste.

85.     Defendants, on numerous occasions, vented hazardous and radioactive waste by opening roll-up doors after release incidents, thus improperly defeating the filtered ventilation system.

## VIOLATION CATEGORY: LAND DISPOSAL

86.     "Land disposal means placement in or on the land, except in a corrective action management unit or staging pile, and includes, but is not limited to, placement in a landfill, surface

impoundment, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, underground mine or cave, or placement in a concrete vault, or bunker intended for disposal purposes." 42 U.S.C. § 6924(k); 40 C.F.R. § 268.2(c).

87.     The "land disposal" of "hazardous" wastes is prohibited. 42 U.S.C. § 6924(d); 42 U.S.C. § 6924(g); OAC Chapter 3745-270; RCRA Permit Section B.36.

88.     While Defendants operated the facility, Defendants' actions and processes produced hazardous waste as defined by 42 U.SC. § 6903(5) and 40 C.F.R. § 261.3, or caused hazardous waste to become subject to regulation, including, but not limited to, the hazardous wastes listed above.

89.     Defendants stored "hazardous waste" within the meaning of 40 C.F.R. §§ 260.10 and 261.3, including, but not limited to, the hazardous wastes identified herein.

90.     The Portsmouth Site is a source of polychlorinated biphenyls ("PCBs").

91.     PCBs are a "solid waste" and "hazardous waste." PCBs are also a component of certain listed hazardous wastes at the Portsmouth Site, such as F-types wastes, and including solvents contaminated by PCBs.

92.     Defendants have land disposed of PCBs in various ways in violation of RCRA.

93.     Defendants' land disposal of PCBs is detailed in the "Summary of Chemical Nonradiological Findings." This was provided to Defendants in the December 17, 2019 Notice Letter and includes detailed information about sampling locations, dates, and results. This Summary shows that PCBs are present at the Site and in the area at concentrations above background, as explained in the Summary through detailed sampling performed by Kaltofen (published in 2019), Kruse (2014), and the DOE. The Summary indicates the precise nature of the samplings, the precise timing of the samplings, the precise locations of the samplings, a map

showing the sampling locations, who performed the samplings, and the precise results of the sampling.

94.     Other samplings listed herein evidence other violations of the land disposal prohibition.

95.     *VIOLATION*: On numerous occasions, as described in the inspection reports and related documents referenced herein, Defendants failed to properly determine, in accordance with the provisions of 40 C.F.R. § 268.7(a)(1) if the hazardous waste they generated at the Portsmouth Site required treatment in order to meet the applicable standards set forth in 40 C.F.R. Part 268, Subpart D for land disposal. This constitutes a violation of the land disposal prohibitions. 42 U.S.C. § 6924(d); 42 U.S.C. § 6924(g); OAC Chapter 3745-270; RCRA Permit Section B.36.

96.     *VIOLATION*: On numerous occasions, as described in the inspection reports and related documents referenced herein, Defendants shipped hazardous waste to off-site treatment, storage, and disposal ("TSD") facilities without sending a notice, as required by 40 C.F.R. § 268.7(a)(2) and (3), indicating whether the material being shipped contained hazardous waste and whether the material being shipped met the applicable treatment standards set forth in 40 C.F.R. Part 268, Subpart D, for land disposal. This constitutes a violation of the land disposal prohibitions. 42 U.S.C. § 6924(d); 42 U.S.C. § 6924(g); OAC Chapter 3745-270; RCRA Permit Section B.36.

97.     *VIOLATION*: On numerous occasions, as described in the inspection reports and related documents referenced herein, Defendants failed to retain, as required by 40 C.F.R. § 268.7(a)(8), on-site a copy of all notices, certifications, demonstrations, waste analysis data, and other documentation produced pursuant to 40 C.F.R. § 268.7 for the specified time period from the date that the waste that was the subject of such documentation was last sent for off-site or on-

site treatment, storage, or disposal. This constitutes a violation of the land disposal prohibitions. 42 U.S.C. § 6924(d); 42 U.S.C. § 6924(g); OAC Chapter 3745-270; RCRA Permit Section B.36.

98.     *VIOLATION*: Defendants have stored and are storing restricted hazardous waste in violation of the prohibition at 40 C.F.R. § 268.50. This constitutes a violation of the land disposal prohibitions. 42 U.S.C. § 6924(d); 42 U.S.C. § 6924(g); OAC Chapter 3745-270; RCRA Permit Section B.36.

99.     *VIOLATION*: Defendants have conducted land disposal in violation of the terms of the RCRA hazardous waste permit. *See* RCRA hazardous waste permit at Section B.36; OAC Chapter 3745-270.

> A.     A Notice of Violation dated August 2, 2011 from the Utah Radiation Control Board for shipment of radioactive waste received on February 7, 2011 by the Energy Solutions facility in Clive, Utah exceeded the facility's waste acceptance of criteria resulting in a civil penalty. This constitutes a violation of RCRA permit section B.36(a). *See also* FBP (2011) and ASER (2013).

> B.     A Notice of Violation dated August 9, 2016 from Ohio EPA based on a self-reported occurrence in which eleven containers of hazardous waste were stored in an unpermitted area and were not inspected or labeled properly. The waste consisted of used personal protective equipment, plastics, and soil. The materials were regulated as hazardous waste because they were used during a sampling project in an area where soil and groundwater are potentially contaminated with TCE, which is a hazardous waste. This

constitutes a violation of RCRA permit section B.36(b). *See also* FBP (2016) and ASER (2018).

C. In late 2017, MCS shipped dilute hydrogen fluoride rinse water resulting from hydrogen fluoride storage tank cleanout and inspection. Each shipment must meet the release limit of less than 3 picocuries/milliliter (pCi/mL), or 0.003pCi/L, of total uranium activity. Approximately 9,025 gallons of dilute hydrogen fluoride were shipped. The average total uranium activity of the shipment was 0.016 pCi/mL (0.000016 pCi/L). This constitutes a violation of RCRA permit section B.36(c). *See also* FBP (2017) and ASER (2019).

D. A violation, notice of which was first received by the Dept. of Energy on June 5, 2014, for failing to include corrosive hazardous waste generated and neutralized in the X-710 Laboratory in the biennial hazardous waste report. This is a violation of RCRA permit section B.36(d). *See also* ASER (2014).

E. A Notice of Violation dated July 2, 2012 from a U.S. EPA and Ohio EPA inspection on June 27, 2011 found a failure to label containers of used oil and used fluorescent lamps with the words "used oil" and "used lamps." This is a violation of RCRA permit section B.36(j). *See also* FBP (2012) and ASER (2014).

F. A Notice of Violation dated August 3, 2012 found that $DUF_6$ cylinders were being stored in the X-745B and X-745F Cylinder Storage yards in violation of Ohio hazardous waste regulations and the RCRA permit. This is a

violation of RCRA permit section B.36(k). *See also* FBP (2012) and ASER (2014).

100. Each failure of Defendants to comply with the land disposal restriction requirements constitutes a separate violation of 42 U.S.C. § 6924, 40 C.F.R. Part 268, OAC Chapter 3745-270, and the RCRA Permit Section B.36.

101. Plaintiffs provided Defendants with the notice required pursuant to 42 U.S.C. § 6972(b).

102. Plaintiffs sent a Notice of Intent on December 9, 2019, and a supplemental exhibit to the Notice of Intent on December 17, 2019. On information and belief, more than sixty days have passed since Defendants received the notice and exhibit.

103. Since the Notice of Intent letter and exhibit were mailed, no action has been taken by the U.S. EPA Administrator, the U.S. EPA Regional Administrator, the U.S. Attorney General, or the State of Ohio, which would preclude Plaintiffs from pursuing a claim under 42 U.S.C. § 6972(a)(1)(A).

104. Pursuant to 42 U.S.C. § 6972(b)(2)(F), a copy of this Complaint will be served on the U.S. Attorney General and the U.S. EPA Administrator.

105. Plaintiffs are entitled to relief under 42 U.S.C. § 6972(a), including (A) requiring Defendants to take all actions necessary to comply with the above-referenced law and regulatory violations; (B) to pay civil fines under 42 U.S.C. §§ 6928(a) and (g), with each day constituting a separate violation; and (C) to pay Plaintiffs' attorney fees and costs, including, but not limited to, expert witnesses.

## VI.    COUNT 2 – RCRA "ENDANGERMENT" CLAIM
### UNDER 42 U.S.C. § 6972(a)(1)(B)

106.    All allegations set forth above are incorporated by reference as if fully set forth herein.

107.    Pursuant to RCRA, 42 U.S.C. § 6972(a)(1)(B), Plaintiffs bring suit against Defendants as past or present generators, transporters, or operators of a waste storage or disposal facility who have or are contributing to the handling, storage, or disposal of any solid waste which may present an imminent and substantial endangerment to health or the environment.

108.    Defendants have "contributed" and are "contributing to the handling, storage, or disposal of solid waste" at the facility because Defendants have operated and are operating the facility through their decisions, actions, and inactions, which have and continue to cause waste in the form of contaminants to escape, posing an imminent and substantial endangerment to health and the environment. The facility's operations and Defendants' decisions, actions, and inactions are alleged in detail in the Factual Allegations section, and generally include, but are not limited to:

> A.    The decision to inappropriately handle waste at the site, causing waste to be released into the environment.
>
> B.    The decision to not invest more money in maintenance, repair, and upgrades to ensure that waste would not be released into the environment.
>
> C.    The decision to improperly inventory waste.
>
> D.    The decision to improperly store waste.

109.    The contaminants that have and continue to emanate into the soil, groundwater, and surface water, inside and outside of the facility.

110.    The contaminants have contaminated the aquifer as indicated by monitoring wells.

111.    There is a pathway of exposure to the environment and humans due to contamination and the direct threat of contamination of Little Beaver Creek, which is visited and used by citizens, including a direct link to water wells that are recharged by Little Beaver Creek.

112.    There have been, and continue to be threats of, ingestion of contaminants from the Site through continued airborne releases, surface water releases, and groundwater releases.

113.    There is a TCE plume that poses a direct threat to aquifers and water wells.

114.    The contaminants that have been and are continuing to be released from the Portsmouth Site combines radioactive materials, pollutants, hazardous substances, heavy metals removed from purification of the yellow cake, and the fluorinated compounds present during the production process.

115.    The radionuclides, including radioactive decay products, mixed wastes, pollutants, heavy metals and fluorinated compounds discharged from the facilities operated by Defendants are found throughout the neighboring community.

116.    Defendants have allowed a mixed waste stream consisting of radionuclides and PCBs and other pollutants to contaminate the surrounding area, as demonstrated by the findings from the environmental investigations. The investigation findings establish that the facility is discharging toxic materials directly into the environment.

117.    The contaminants are toxic, hazardous, and harmful to human health and the environment.

118.    Some of the toxic and harmful health effects associated with these hazardous wastes, such as PCBs, dioxins, and dioxin-like PCBs, include, but are not limited to: damage to skin, liver damage, cancer, reproductive and developmental problems, damage the immune system, and interference with hormones.

119. On information and belief, during the time period that Defendants operated the Portsmouth Site and its facilities, harmful contaminants have been and continue to be released, spilled, leaked, emitted, and discharged from the Site's facility, in the vicinity of Piketon, migrating into the soil, groundwater, and surface water. These contaminants currently threaten to harm the public health and environment.

120. Though it is not a prerequisite for a suit under 42 U.S.C. § 6972(a)(1)(B), much of the solid waste that constitutes the "endangerment" is "hazardous" within the meaning of RCRA.

121. The continued neglect of the Portsmouth Site poses a direct threat to health via uncontrolled releases and escape of toxic contaminants throughout the downstream watershed, exposing the wildlife and humans to lethal and non-lethal health threats and environmental damage. The impact to groundwater threatens health and the environment that draw sustenance from the aquifer, which is an EPA underground drinking water source. The watercourses impacted by the Site's discharges form conduits that serve as exposure pathways to humans, wildlife, vegetation, and the environment throughout the watershed. The impact of the contamination may volatize and migrate beyond the stream through natural processes. The contamination caused by Defendants includes hazardous substances in excess of state and federal standards that are protective of health and the environment, and sampling and other analysis confirms the ongoing threat. The impact of this contamination may also present an imminent and substantial endangerment to employees, workers, and visitors to the Site. The contamination can and does aerate and form a toxic air plume that is toxic to human health and the environment and is evidenced by the type and character of waste at issue. Many of the toxic contaminants emanating from the Portsmouth Site in uncontrolled releases, and identified in sampling results, present a reasonable prospect of serious potential harm to humans and the environment.

122.     At present, there is a clear pathway of exposure and credible exposure scenario between the facility, its released and releasing contaminants, and the neighboring environment and neighboring communities. The potent contaminants combined with the exposure pathway to the neighboring community and environment amounts to an ongoing, imminent, and substantial endangerment to human health and the environment.

123.     The following credible exposure pathways between Defendants' contaminants and the neighboring community and environment include, but are not limited to:

A.     Surface water transport pathway including suspended and deposited sediments;

B.     Airborne transport pathway of contaminated particulate matter;

C.     Dermal contact exposure pathway via contaminated soils and sediments;

D.     Ingestion exposure pathway for soils, sediments or indoor dusts;

E.     Inhalation exposure pathway for airborne particulate matter;

F.     Wildlife to human exposure pathway via contaminated fish and wildlife;

G.     Threats to on-site workers, trespassers, and visitors to the facility site;

H.     Threats to drinking water wells, particularly those with underground drinking water aquifer sources connected to Little Beaver Creek; and

I.     The operators' own documentation showing that a groundwater plume of contamination is entering Little Beaver Creek.

124.     Defendants have engaged in the storage and/or disposal of hazardous wastes by operating a solid-waste facility with emission controls inadequate to limit discarded radionuclides from escaping into the atmosphere and environment.

125. Defendants have failed and are failing to prevent the migration of these contaminants from the Portsmouth Site into the environment where they threaten human health and the environment.

126. The facilities operated by Defendants have contributed to, and continue to contribute to additional and continual releases of mixed waste found in soils throughout the Portsmouth Site that are re-suspended into the atmosphere through typical industrial activities, as demonstrated by the findings from the environmental investigations.

127. The 2017 PORTS Annual Site Environmental Report ("ASER") (attached hereto as **Exhibit B**), found PCBs in sediments at the Portsmouth Site's water discharge points, including in Little Beaver Creek at the location of the PORTS holding pond. This includes, but is not limited to, releases of Technetium (Tc-99).

128. Violation is also evidenced by the 2017 DOE ASER where it states that, "In 2017, the average annual dose (8736 hours) recorded at the cylinder yards near Perimeter Road was 739 mrem/year."

129. Testing results have also revealed the toxic metals cadmium, beryllium, and arsenic at multiples of the expected background. This testing was provided to Defendants in the December 17, 2019 Notice Letter, and which includes detailed information about sampling locations, dates, and results.

130. The 2014 Ohio University Study (attached hereto as **Exhibit C**) found 40 PCB spills at PORTS, causing PCB concentrations as high as 26,677 parts per billion, compared to background at less than 5 parts per billion. This testing was provided to Defendants in the December 17, 2019 Notice Letter, and which includes detailed information about sampling locations, dates, and results.

131. The 2015 Final Record of Decision of the DOE found "Leaks and off-gassing from process gas equipment (PGE) or components being repaired or replaced resulted in the release of airborne uranium, transuranic constituents, fission products, fluorine, and hydrogen fluoride gas (DOE 2000a). Various hazardous substances such as asbestos, beryllium, lead, trichloroethene (TCE) and other solvents, polychlorinated biphenyls (PCBs), acids, chromium, nickel, lithium, and mercury were also used. Radioactive materials and other harmful and hazardous substances were spilled or released to the environment from production-related facilities and attendant work activities. Activities to manage wastes and liquid process effluents evolved over the operating lifetime of PORTS."

132. A 2013 Ohio University study of Little Beaver Creek (attached hereto as **Exhibit D**) found that radiological and chemical contaminants entering Little Beaver Creek from the Site, exposing the residents and the environment to harmful contamination.

133. The 2013 Ohio University study also noted 104 reported spills, forty of which were PCB-contaminated oil spills.

134. The 2013 Ohio University study indicated that testing of off-site sediments revealed PCB contamination from the Portsmouth Site, including at the mouth of Little Beaver Creek. The study also found that on-site concentrations were over 2,000 higher than background levels. The study found PCB-118, a dioxin-like form of PCB, at the mouth of Little Beaver Creek.

135. Centrus "contributed to" the endangerments by improperly maintaining the gaseous diffusion plant at the Portsmouth Site while systems were permanently disengaged, and equipment prepared for eventual decommissioning. Centrus was also responsible for operating the American Centrifuge Lead Cascade Facility ("Lead Cascade"). In 2016, Centrus ceased uranium enrichment operations at the Lead Cascade which was followed by the removal of uranium gas from the

centrifuges and process piping, dismantling the equipment, and other actions needed to ultimately decommission the facility. Centrus is the successor-in-interest to USEC.

136. USEC "contributed to" the endangerments by improperly conducting uranium enrichment operations at the Portsmouth gaseous diffusion plant from July 1993 until 2001. Thereafter, from 2001 to 2011, USEC "contributed to" the endangerments by maintaining the gaseous diffusion plant initially in "cold standby" and later "cold shutdown" where systems were permanently disengaged, and equipment prepared for eventual decommissioning. USEC also "contributed to" the endangerments by operating the American Centrifuge Lead Cascade Facility ("Lead Cascade") from 2004 until USEC declared bankruptcy in 2014 and in its reorganization was renamed Centrus Energy Corporation.

137. UDS "contributed to" the endangerments by improperly designing, building, and operating the depleted hexafluoride conversion plant ("DUF6 Conversion Plant") located on the Portsmouth site. UDS operated the DUF6 Conversion Plant from 2002 until 2010.

138. BWXT "contributed to" the endangerments by improperly operating the DUF6 Conversion Plant from 2010 until 2016. BWXT was also responsible for continuing cylinder surveillance and maintenance services for the inventory of DUF6, low-enrichment hexafluoride (UF6), normal UF6, and other cylinders.

139. MCS "contributed to" the endangerments by improperly operating the DUF6 Conversion Plant from 2016 to present. MCS was responsible for providing cylinder surveillance and maintenance for the DUF6 Conversion Plant and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at Paducah and Portsmouth to uranium oxide; reusing, storing, transporting, and/or disposing of DUF6 conversion process end-products;

selling the aqueous hydrofluoric acid (AqHF) product; and providing surveillance and maintenance services for the cylinder storage yards.

140.    Bechtel "contributed to" the endangerments by improperly carrying out their responsibility for environmental remediation at the Portsmouth Site. Bechtel was responsible for environmental remediation at the Portsmouth Site from 1997 to 2005.

141.    Lata/Parallax "contributed to" the endangerments by improperly carrying out their responsibility for environmental remediation at the Portsmouth Site. Lata/Parallax was responsible for environmental remediation at the Portsmouth Site from 2005 to 2010. Lata/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning facilities, highly enriched uranium disposition, operating the site waste storage facilities and surveillance and maintenance activities.

142.    Flour-BWXT "contributed to" the endangerments by improperly carrying out their responsibility for environmental remediation at the Portsmouth Site. Fluor-BWXT was responsible for environmental remediation at the Portsmouth Site from 2005 to present. Fluor-BWXT is responsible for construction of an on-site waste disposal facility to be used for the disposal of more than 2 million cubic yards of waste generated from the Portsmouth Site's decontamination.

143.    The endangerment extends to the environment (soil, groundwater, surface water) and humans (site workers, trespassers, residents in the neighboring community, and heightened for humans who live near Little Beaver Creek or rely on groundwater that is hydrologically linked to the Creek).

144.    The impacts and continued endangerment extend beyond the Portsmouth Site's property boundaries and include areas to which the contaminants have migrated and threaten to

migrate, including, but not limited to, downstream of the Portsmouth Site and downwind of the Portsmouth Site.

145.     The continuing threat to health and the environment will remain unabated until the Site and affected areas are fully remediated and restored, and additional protections and measures are taken to ensure the long-term integrity and safety of the Portsmouth Site.

146.     Plaintiffs provided Defendants with the notice required pursuant to 42 U.S.C. § 6972(b).

147.     Plaintiffs sent a Notice of Intent on December 9, 2019, and a supplemental exhibit to the Notice of Intent on December 17, 2019. On information and belief, more than sixty days have passed since Defendants received the notice and exhibit.

148.     To the extent that any action has been undertaken by anyone to address the contamination, it is insufficient to abate the endangerment.

149.     Since the Notice of Intent letter and exhibit were mailed, no action has been taken by the U.S. EPA Administrator, the U.S. EPA Regional Administrator, the U.S. Attorney General, or the State of Ohio, which would preclude Plaintiffs from pursuing a claim under 42 U.S.C. § 6972(a)(1)(B).

150.     Pursuant to 42 U.S.C. § 6972(b)(2)(F), a copy of this Complaint will be served on the U.S. Attorney General and the U.S. EPA Administrator.

151.     The Court has jurisdiction pursuant to 42 U.S.C. § 6972(a) to enter injunctive relief to abate the endangerment.

### VII.     COUNT 3 – CLEAN WATER ACT CLAIM UNDER 33 U.S.C. § 1365(a)(1)(A)

152.     All allegations set forth above are incorporated by reference as if fully set forth herein.

153.    Defendants are in ongoing violation of the CWA through the discharge of pollutants directly into Waters of the United States.

154.    Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A), permits any citizen to commence a civil action on his own behalf "against any person … who is alleged to be in violation of (A) an effluent standard or limitation under this chapter …." Section 505(f)(1) of the Clean Water Act, 33 U.S.C. § 1365(f)(1), defines "effluent standard or limitation under this chapter" as meaning, *inter alia*, an unlawful act under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a); *see also* 33 U.S.C. § 1342.

155.    A violation of an "effluent standard or limitation" includes, among other enumerated actions, (a) any discharge of a pollutant to the Waters of the United States without NPDES permit authorization, and (b) any contravention of a NPDES permit condition or requirement. 33 U.S.C. § 1365(f).

156.    Plaintiffs live near, own property near, work near, and recreate near the Waters of the United States and wetlands downstream of the Portsmouth Site's point sources through which Defendants discharge pollutants.

157.    Plaintiffs consider the waters and wetlands and aquatic life and other wildlife in these areas to be significant parts of the area in which they live.

158.    Plaintiffs want the area's waters and wetlands to contain as little pollution as possible.

159.    Plaintiffs walk near or recreate near or in the area's waters.

160.    Plaintiffs enjoy viewing aquatic life in the waters.

161.    Some Plaintiffs have children who play in and around the water and wetlands.

162.    Plaintiffs are concerned about their health and safety, and the health and safety of children, as a result of having spent time in the presence of pollutants discharged by the Portsmouth Site into the water and wetlands.

163.    Plaintiffs are concerned about the health of the aquatic life and other wildlife in and around the water and wetlands impacted by the pollutants discharged from the Portsmouth Site.

## VIOLATION CATEGORY: DISCHARGE WITHOUT PERMIT AND PERMIT VIOLATIONS

164.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and ORC 6111.04 prohibit the discharge of pollutants into navigable Waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Section 301(a) prohibits, *inter alia*, such discharges not authorized by, or in violation of, the terms and conditions of an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

165.    The Portsmouth Site constitutes a discrete and discernable point source of radioactive contaminants and other contamination, which is leaking, draining, releasing, and emitting from the Portsmouth Site.

166.    Other "point sources" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), include, but are not limited to, the "outfalls" listed and identified within the facility's NPDES discharge permits.

167.    Other "point sources" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), include, but are not limited to, conveyances such as storm drains on the facility's roofs, ponds, and the on-site swales and ditches through which stormwater flows.

168.    Discharges from these point sources constitute the discharge of pollutants from a point source directly into Waters of the United States.

169.     The Portsmouth Site does not have a permit under the federal Clean Water Act's National Pollutant Discharge Elimination System to discharge some of the pollutants the Portsmouth Site is discharging.

170.     The CWA defines "pollutant" as including "solid waste" and "chemical wastes." 33 U.S.C. § 1362(6).

171.     Defendants have and are discharging pollutants, including polychlorinated biphenyls (PCBs), and radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium and Plutonium, as well as heavy metals and other harmful constituents described in samplings referenced herein. These discharges are directly into Waters of the United States.

172.     Defendants' failure to maintain subsurface infrastructure has caused a failure and violation for unpermitted discharges regarding ponded water near the X-745F Cylinder Storage Yard north of the X-344 Facility, as noted by Ohio EPA in a letter dated August 9, 2018.

173.     Defendants have discharged mercury in violation of law and permit as their own NPDES permit modification requests in 2016 and 2017 have conceded.

174.     The CWA defines "navigable waters" as the "waters of the United States." 33 U.S.C. § 1362(7). Regulations and case law establish that "waters of the United States" includes, in turn, all tributaries to interstate waters. *See, e.g.,* 40 C.F.R. § 122.2. Waters of the United States that the facility discharges into includes the facility's land itself, which is located in a floodplain. Little Beaver Creek is also a "water of the United States" under the law.

175.     Defendants' discharge of pollutants or contaminants from the Portsmouth Site into waters of the United States without a proper permit violates the federal Clean Water Act and regulations promulgated thereunder. Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, and ORC 6111.04.

176. Defendants' CWA discharge permit(s) (including, but not limited to, Fluor—01O00000, American Centrifuge Operating—OIS00023, Mid-American Conversion—0IS00034) do not allow for the discharge of radionuclides or any such mixed waste stream(s), nor mercury at the levels that the Portsmouth Site has been found to discharge, such as those found on-site and off-site by testing referenced herein.

177. On information and belief, the testing at the Portsmouth Site and in the vicinity of radioisotopes and chemical quality indicates that Defendants are in ongoing violation of the permit. These ongoing discharges are identified in the exhibits to the December 17, 2019 Notice Letter, noting the location and type of ongoing discharges.

178. On information and belief, the testing indicates that rainwater now interacts with contaminated soils at and near the site, and discharges heavily contaminated radionuclides and other pollutants and mixed wastes into nearby streams, and specifically tributaries to the Scioto River. Defendants' permits do not allow these discharges.

179. Plaintiffs provided Defendants with the notice required pursuant to 33 U.S.C. § 1365(b).

180. Plaintiffs sent a Notice of Intent on December 9, 2019, and a supplemental exhibit to the Notice of Intent on December 17, 2019. On information and belief, more than sixty days have passed since Defendants received the notice and exhibit.

181. Since the Notice of Intent letters were mailed, no action has been taken by the U.S. EPA Administrator, the U.S. EPA Regional Administrator, the U.S. Attorney General, or the State of Ohio, which would preclude Plaintiffs from pursuing a claim under CWA.

182. Pursuant to 33 U.S.C. § 1365(c), a copy of this Complaint will be served on the U.S. Attorney General and the U.S. EPA Administrator.

183.    The Court has jurisdiction pursuant to CWA Section 309 to enter injunctive relief to bring Defendants into compliance and abatement of violations.

## VIII.   COUNT 4 – CLEAN AIR ACT CLAIM UNDER 42 U.S.C. § 7604(a)

184.    All allegations set forth above are incorporated by reference as if fully set forth herein.

185.    Pursuant to citizen suit provision of 42 U.S.C. § 7604(a)(1), Plaintiffs bring a claim for Defendants' violations of the Clean Air Act ("CAA").

186.    As evidenced by environmental sampling, large quantities of hazardous radionuclides, pollutants, toxic metals, and fluorinated compounds have been discharged from the Portsmouth Site's facility, and have settled onto the soils and buildings, and have also been discharged to surface waters and into groundwaters of the areas surrounding PORTS.

187.    This provision authorizes suits "against any person ... who is alleged to have violated or to be in violation of (A) an emission standard or limitation under this chapter..." 42 U.S.C. § 7604(a)(1). As defined, an "emission standard or limitation" includes the requirements set forth under 42 U.S.C. § 7412 without regard to whether such requirement is expressed as an emission standard or otherwise, and "any permit term or condition." 42 U.S.C. § 7604(f)(3) and (4).

188.    Ohio EPA air pollution control law is found in ORC 3704. Ohio EPA air pollution control regulations are found in the OAC in chapters 3745-14 to 3745-26, 3745-31, 3745-71 to 3745-73, 3745-77 to 3745-80, 3745-100, 3745-103, 3745-104, and 3745-109 to 3745-114.

189.    In 1989, EPA promulgated regulations to control the emissions of radionuclides from various sources. *See* 54 Fed. Reg. 51,703 (Dec. 15, 1989). Subpart I of these regulations—found at 40 C.F.R. §§ 61.100 through .109—applies to radionuclide emissions from federal

facilities other than Nuclear Regulatory Commission licensees not covered by Subpart H. Subpart I applies to the Site. These regulations contain emissions standards, reporting standards, and record-keeping standards (40 C.F.R. §§ 61.102, .104, .105, .107).

## VIOLATION CATEGORY: HAP EMISSIONS

190.    The Clean Air Act regulates the release of "hazardous air pollutants" ("HAPs"). 42 U.S.C. § 7412. HAPs threaten "adverse human health effects ... or adverse environmental effects." 42 U.S.C. § 7412(b)(2).

191.    Radionuclides are identified as HAPs under the CAA. *See* 42 U.S.C. § 7412(b) (identifying radionuclides as a hazardous air pollutant); *see also* 44 Fed. Reg. 21,704 (April 11, 1979) (EPA's listing of radionuclides as hazardous air pollutant). Radionuclides are determined to be carcinogenic by the EPA. *See* 54 Fed. Reg. 51654, 51657 (December 15, 1989); 44 Fed. Reg. 76,738 (1979) ("exposure to radionuclides increases the risk of human cancer and genetic damage."). EPA "concluded that emission of radionuclides may reasonably be anticipated to endanger public health, and that radionuclides constitute hazardous air pollutants within the meaning of the Clean Air Act." 44 Fed. Reg. 76,738 (1979).

192.    On information and belief, the Portsmouth Site has and is releasing chlorinated solvents and radionuclides via air pollutant sources from the stacks and also from fugitive emissions, as well as asbestos. Samplings referenced herein also evidence that contaminated dust stems from illegal releases from the Portsmouth Site.

193.    The Clean Air Act Section 112 (42 U.S.C. § 7412) prohibits operators of stationary sources from emitting hazardous air pollutants or operating a stationary source in violation of applicable limitations and standards. 42 U.S.C. § 7412(f)(4) ("No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such

standard"); 42 U.S.C. § 7412(i)(3)(A) ("...no person may operate such source in violation of such standard, limitation or regulation..."); *see also* ORC 3704.05.

194.    "National Emission Standards For Hazardous Air Pollutants" under Sections 100 and 102 of 40 C.F.R. Part 61, Subpart I, and the CAA, 42 U.S.C. § 7401, establish a limit whereby the emission of radionuclides to the ambient air from a facility may not exceed an amount that would cause any member of the public to receive in any year an effective dose equivalent of 10 millirem (mrem) per year.

195.    Defendants are in violation of the Subpart I standards due to having emitted and continuing to emit radiation and or radionuclides at a rate creating an exposure in excess of the allowable 10 millirem (mrem) per year dose to a member of the public, and for failing to properly report and keep records of such emissions.

196.    Violation is evidenced by the 2017 DOE ASER with respect to asbestos releases from the Portsmouth Site.

197.    Off-site sampling evidences unpermitted or excessive emissions.

198.    Violation is evidenced by the emissions of hazardous air pollutants including, but not limited to, radionuclides such as uranium, plutonium, neptunium, other enriched uranium products, thorium and other decay products into the air from the decommissioning, reclamation, and demolition work now being conducted at the Site.

## VIOLATION CATEGORY: UNPERMITTED EMISSIONS

199.    Defendants have operated the Portsmouth Site under CAA permits issued by the Ohio Environmental Protection Agency including, but not limited to, the following permits: Fluor—P0106292, P0109662; American Centrifuge Operating—P0115127, P0116605, P0116606, P0118536, P0117909, P0112459, P0110957, USEC P0105172, P0104604, P0104605, P0104426 (original 06-2855).

200.    Defendants are in violation of Section 112, 42 U.S.C. § 7412, as a result of the unpermitted and unlawful discharge of hazardous air pollutants including, but not limited to, radionuclides such as uranium, plutonium, neptunium, other enriched uranium products, thorium and other decay products and related contaminants evidenced by samplings. These discharges into the air are from the operations, decommissioning, reclamation, and demolition work now being conducted at the Portsmouth Site. *See also* ORC 3704.05.

201.    Plaintiffs provided Defendants with the notice required pursuant to 42 U.S.C. § 7604 and 40 C.F.R. Part 54.

202.    Plaintiffs sent a Notice of Intent on December 9, 2019, and a supplemental exhibit to the Notice of Intent on December 17, 2019. On information and belief, more than sixty days have passed since Defendants received the notice and exhibit.

203.    Since the Notice of Intent letters were mailed, no action has been taken by the U.S. EPA Administrator, the U.S. EPA Regional Administrator, the U.S. Attorney General, of the State of Ohio, which would preclude Plaintiffs from pursuing a claim under the Clean Air Act.

204.    Pursuant to 42 U.S.C. § 7604 and 40 C.F.R. Part 54, a copy of this Complaint will be served on the U.S. Attorney General and the U.S. EPA Administrator.

205.    The Court has jurisdiction pursuant to 42 U.S.C. § 7604 to enter injunctive relief.

## DEMAND FOR JURY TRIAL

206.    Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)    An Order requiring Defendants to pay civil penalties consistent with federal law;

(2)     An Order requiring the full abatement of the endangerment;

(3)     An Order requiring injunctive relief to address all federal violations;

(4)     An Order implementing a remediation including full site characterization and cleanup of Plaintiffs' properties to abate the endangerment caused;

(5)     An Order implementing a medical sampling and testing;

(6)     Prejudgment and post-judgment interest;

(7)     An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(8)     That the Court order Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration; and

(9)     Such other relief as the Court or Jury may deem appropriate.

Respectfully submitted,

/s/ Stuart E. Scott
Stuart E. Scott (0064834)
Kevin C. Hulick (0093921)
**Spangenberg Shibley & Liber LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924
sscott@spanglaw.com
khulick@spanglaw.com

Mark F. Underwood (pro hac vice to be submitted)
**Underwood Law Offices**
923 Third Avenue
Huntington, WV  25701
Telephone: (304) 209-4387
munderwood@underwoodlawoffices.com

Jason A. Leasure
**Vital & Vital, L.C.**
536 Fifth Avenue
Huntington, WV  25701
Telephone: (304) 525-0320
jleasure@vitallc.com

Celeste Brustowicz (*pro hac vice* to be submitted)
Stephen H. Wussow (*pro hac vice* to be submitted)
Victor Cobb (*pro hac vice* to be submitted)
**Cooper Law Firm, LLC**
1525 Religious Street
New Orleans, LA  70130
Telephone: (504) 399-0009
cbrustowicz@sch-llc.com
swussow@sch-llc.com
vcobb@sch-llc.com

Stuart H. Smith (of counsel to Cooper Law Firm, LLC)
(*pro hac vice* to be submitted)
**Stuart H. Smith, LLC**
508 St. Philip Street
New Orleans, LA  70118
Telephone: (504) 566-1558
ssmith@sch-llc.com

Kevin W. Thompson (*pro hac vice* to be submitted)
David R. Barney, Jr. (*pro hac vice* to be submitted)
**Thompson Barney**
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

**ATTORNEYS FOR PLAINTIFFS**